## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
 )
   Plaintiff, )
 )
v. ) Case No. CR-22-00464-JD
 )
CHETO FIXICO LARA, )
 )
   Defendant. )

## ORDER

Before the Court is Defendant Cheto Fixico Lara's Motion to Suppress ("Motion") [Doc. No. 41]. The United States filed a response in opposition [Doc. No. 44], and Mr. Lara supplemented his Motion [Doc. No. 49], attaching a copy of the preliminary hearing transcript[1] from Mr. Lara's related state case. [Doc. No. 49-1].

A hearing was held on May 2, 2023, at which Mr. Lara personally appeared through his attorney, John W. "Billy" Coyle, IV, and the United States appeared through Assistant United States Attorney Jason M. Harley. The Court received the testimony of two witnesses: Oklahoma City Police Department ("OCPD") Officer Andre Lizar and Defendant Cheto Fixico Lara.

An aerial photograph of the OnCue at Northwest Expressway and West Wilshire Boulevard in Oklahoma City was offered into evidence and admitted for purposes of the hearing as Defendant's Exhibit No. 1. It is attached to this Order. *See* Attachment 1.

---

[1] Oklahoma City Police Department Officer Andre Lizar was the only witness who testified at the state preliminary hearing. His prior testimony is included at pages 6 through 21. The Court uses ECF page numbering from the top of docket filings in this Order.

During cross-examination, Officer Lizar drew an X depicting his location in his patrol car in the OnCue parking lot on July 21, 2022, and he drew an O depicting where he first saw Mr. Lara leaving the parking lot in his vehicle. The record also includes video footage from the body camera worn by Officer Lizar on July 21, 2022, and video from inside Officer Lizar's patrol car and from his dash camera, which were conventionally filed with the Court. [Doc. Nos. 45, 46, 52, 53]. The Court has reviewed all videos in their entirety.[2] Upon consideration of the filings and evidence presented, and having reviewed the relevant law, the Court issues its ruling.

## I.      PROCEDURAL HISTORY AND BACKGROUND

On November 1, 2022, a federal grand jury returned a one-count Indictment against Mr. Lara for felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [Doc. No. 1]. Mr. Lara's jury trial is set for May 9, 2023. [Doc. Nos. 37, 42]. The charge stems from a pat-down search of Mr. Lara's person following a traffic stop on July 21, 2022, in Oklahoma City around 2:40 a.m. by OCPD Officer Andre Lizar. Mr. Lara seeks to suppress the firearm obtained from his person, the ammunition therein and the ammunition in the trunk of the car, which was seized as part of the custodial inventory search after his arrest, and his statements made to Officer Lizar following the traffic stop.

---

[2] The record also includes an aerial photograph of the intersection at West Wilshire Boulevard and Northwest Expressway in Oklahoma City, which includes the pertinent OnCue convenience store and parking lot. [Doc. No. 41-2]. This photograph is the same as Attachment 1, absent Officer Lizar's markings. Additionally, of record are the OCPD incident reports and photographs of the approximate location where the traffic stop occurred. [Doc. Nos. 44-1, 44-4, 44-5]. The Court has reviewed this evidence in its entirety.

Mr. Lara challenges the initial stop, his removal from the vehicle, and subsequent detention and search of his person, and asserts that any evidence derived from the traffic stop should be suppressed as fruit of the poisonous tree.[3] In response, the government asserts that the traffic stop was justified at its inception, that Mr. Lara was lawfully detained, and that the subsequent discovery of the firearm possessed by Mr. Lara should be admissible at trial.

## II.   <u>FINDINGS OF FACT</u>[4]

On July 21, 2022, around 2:40 a.m., OCPD Officer Andre Lizar was working patrol at the OnCue convenience store near Northwest Expressway and West Wilshire

---

[3] At page 3 of the Motion, Mr. Lara also asserts that "the search of his vehicle violated his constitutional rights under both the United States Constitution and the Oklahoma Constitution." Motion at 3. This issue is raised perfunctorily in the Motion, and there is no analysis, nor did it come up at the motion hearing and defense counsel never pressed it. Mr. Lara is not currently charged with being a felon in possession of ammunition, and there is no indication the towing of the vehicle and inventory custodial search was improper based on the evidence of record. Mr. Lara was arrested. It was roughly 3:00 a.m., and no one was present at the scene to take the car. Mr. Lara also never asked that anyone be allowed to come retrieve his vehicle. Leaving the car where it was could lead to theft or vandalism; thus, it appears that impoundment of the vehicle was necessary for public safety. When a vehicle is impounded, police must secure and inventory the vehicle's contents. Additionally, Mr. Lara never asserts that OCPD violated any of its policies by impounding the vehicle. *See, e.g.*, *United States v. Trujillo*, 993 F.3d 859 (10th Cir. 2021); *South Dakota v. Opperman*, 428 U.S. 364 (1976).

[4] Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to "state its essential findings on the record" when deciding a motion that involves factual issues. *See* Fed. R. Crim. P. 12(d). These findings of fact shall serve as the Court's essential findings for purposes of Rule 12(d). The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure. In deciding such preliminary questions, the Federal Rules of Evidence, except those involving privilege, do not apply. *See* Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress.

Boulevard in Oklahoma City. He was seated inside his patrol car in the OnCue parking lot when he observed a silver Toyota Camry make an improper right turn out of the OnCue parking lot. Officer Lizar's location in the OnCue parking lot when he spotted the driver make the improper right turn is depicted at the X in Attachment 1. The silver Toyota Camry is depicted at the O in Attachment 1.

The righthand turn was improper because the driver turned into the left lane of the two westbound lanes of traffic rather than the closest right lane, in violation of Okla. Stat. tit. 47, Section 11-601(1) and Oklahoma City Municipal Code Section 32-236(1). Those provisions require both the approach for a right turn and the execution of a right turn to be made as close as practicable to the right-hand curb or edge of the roadway.

Officer Lizar[5] testified that the traffic violation is not visible from his dashcam video, and he explained why. First, his dashcam activates either manually or when the emergency lights are activated. Additionally, the way the computer software is set up, the video footage from his dashcam will go back 30 seconds prior to its activation, but it only captures video from the 30 seconds prior and not audio. His bodycam works similarly in

---

[5] In making its factual findings, the Court notes for the record that based upon its review of the record and its observations at the hearing, including the officer's demeanor and body language and responses to questions, the Court finds Officer Lizar's testimony to be credible. *See, e.g.*, *United States v. Romero*, 247 F. App'x 955, 960 (10th Cir. 2007) (unpublished) (explaining that the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters most appropriate for resolution by the district court") (citation omitted); *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997) (same). The Court does not find Mr. Lara's testimony credible and discounts most of it. The Court discusses its credibility determinations in more detail in the analysis section below.

that he can activate it manually or it automatically activates when the emergency lights in his patrol vehicle are activated, if he arms his Taser, or if he pulls his service weapon.[6] After he observed what he perceived to be a traffic violation by the driver of the silver Toyota Camry, Officer Lizar put his vehicle in drive and attempted to catch up to the vehicle.

Officer Lizar testified that he was directly behind the silver Camry, and nothing was obstructing his view. He was positioned where he could see traffic coming off Northwest Expressway and West Wilshire Boulevard. He testified that the OnCue parking lot had two exits on the southside, and that he and the driver of the silver Camry both exited the west exit onto West Wilshire Boulevard. This is consistent with where Officer Lizar marked his patrol car and Mr. Lara's car in Attachment 1.

Officer Lizar testified that he caught up to the Camry and activated his emergency lights on his patrol car.[7] This, in turn, activated his dashcam and bodycam. Thus, the dashcam did not capture the traffic violation. Officer Lizar indicated that had he activated his lights earlier, it is possible the dashcam could have captured the traffic violation. However, he testified there is a risk in activating the lights too soon that the driver will

---

[6] This explanation is consistent with what other OCPD officers have given in other cases before this Court involving traffic stops. *See, e.g., United States v. Jones*, Case No. CR-22-00376-JD, 2022 WL 18026333, at *3 (W.D. Okla. Dec. 30, 2022).

[7] This is consistent with Officer Lizar's preliminary hearing testimony. He testified at the preliminary hearing that he was patrolling in the area of Northwest Expressway and Wilshire Boulevard, he got behind Mr. Lara's vehicle right by the OnCue, and, after observing Lara make an improper right turn by turning into the lefthand lane rather than the righthand lane, he initiated a stop by turning on his emergency lights. [Doc. No. 49-1 at p. 6, lines 20–21; p. 7, lines 1–16; p. 12, lines 24–25; p. 13, lines 1–18].

attempt to elude or hide. Thus, his decision in waiting to activate his emergency lights was a tactical decision.

The driver of the Camry turned southbound onto Lyrewood Lane and immediately stopped after the intersection. Officer Lizar approached the driver's side of the vehicle, identified himself, and asked the sole occupant and driver of the vehicle for his driver's license. The driver responded in the affirmative that he had a valid driver's license. Officer Lizar did not immediately inform the driver of the reason for the stop. Officer Lizar testified that for nearly a minute, the driver looked for his driver's license, checking his pockets and his center console, and he was unable to produce his license. Officer Lizar testified that he gives a person a certain amount of time to retrieve their license, but if they are unable to supply it or he starts to feel uncomfortable with where they are looking for the license, then he will ask them to step out of the vehicle. Officer Lizar's testimony is consistent with his bodycam video, which shows the driver repeatedly checking his pockets, the center console, the driver's side door panel, and the passenger seat for nearly a minute, but he never produced a driver's license. *See* Bodycam Video at 2:49:47 to 2:50:46.

Officer Lizar then asked the driver for his name, and the driver identified himself as Cheto Lara. Officer Lizar testified that he has experienced persons giving fake names during traffic stops; thus, at that point in time he did not know if Mr. Lara was the driver's true name or whether Mr. Lara had a history of violence or eluding police, and there was no driver's license to verify his identity. Officer Lizar asked if Mr. Lara had any weapons in the vehicle, and Mr. Lara said, "No sir." *See* Bodycam Video at 2:50:53.

Officer Lizar then explained to Mr. Lara that since he could not find his driver's license he needed to step out of the vehicle. Officer Lizar opened the driver's side door and assisted Mr. Lara in stepping out of his vehicle. Officer Lizar testified that a failure to produce one's driver's license upon a police officer's request is a violation of Oklahoma law and city code.

As Mr. Lara stepped out from his car, he asked Officer Lizar "what's the problem though?" Officer Lizar asked Mr. Lara to place his hands behind his back, and Officer Lizar placed him in handcuffs. Mr. Lara again asked what the problem was, and Officer Lizar stated, "You don't have your driver's license with you, man." *See* Bodycam Video at 2:51:23.

Officer Lizar stated on direct examination that the reason he placed Mr. Lara in handcuffs was for officer safety purposes and because Mr. Lara had violated two laws. He reiterated on redirect examination that he handcuffed Mr. Lara because Mr. Lara could not produce his driver's license after being given ample time to find it and for officer safety reasons. He testified that he routinely handcuffs people and conducts a weapons frisk before escorting them back to his patrol car to run computer checks. Officer Lizar stated that Mr. Lara's failure to produce his driver's license is an arrestable offense, and he believed he had probable cause to arrest Mr. Lara for that offense. He added that in a probable cause arrest situation, he would also frisk the detainee.[8]

---

[8] This testimony is consistent with Officer Lizar's preliminary hearing testimony. At the motion hearing, he never states that he arrested Mr. Lara for not having his driver's license or for the traffic violation; he just indicates that both were arrestable offenses. At the preliminary hearing, Officer Lizar testified that Mr. Lara was detained, rather, placed in handcuffs, for lacking his identification. [Doc. No. 49-1 at p. 9, lines 7–

Officer Lizar walked Mr. Lara back to his patrol car. Mr. Lara asked why Officer Lizar pulled him over, and Officer Lizar stated for an improper right turn. *See* Bodycam Video at 2:51:55. Mr. Lara proceeded to dispute the traffic violation, and Officer Lizar stated that Mr. Lara had turned into the left lane instead of the right lane. *See id.* at 2:52:04.

Outside of his patrol car, Officer Lizar conducted a pat-down search of Mr. Lara and discovered a firearm on Mr. Lara's right hip concealed in his shorts near the waistband. Officer Lizar testified that the firearm was a Taurus 9-millimeter handgun. He placed Mr. Lara in the backseat of his patrol car and asked Mr. Lara if he was a felon. Mr. Lara responded that he was. Officer Lizar testified that he confirmed through the Oklahoma State Courts Network, or OSCN, that Mr. Lara was a convicted felon.

While Officer Lizar and Mr. Lara were alone in the patrol car together awaiting the tow truck for the Camry, Mr. Lara asked what he was being charged with, and Officer Lizar responded, "felon in possession of a firearm." *See* In Car Camera Video at 3:19:58. Officer Lizar also informed Mr. Lara that the firearm was stolen, and he was being charged with that too.[9]

---

13]. Officer Lizar indicated that after finding the firearm on Mr. Lara's person and confirming he was a felon, he became an arrestee rather than a detainee. *See id.* at p. 20, lines 15–20.

[9] Officer Lizar testified at the motion hearing that at that point in time Mr. Lara was under arrest for being a felon in possession of a firearm. Officer Lizar testified at the state preliminary hearing that Mr. Lara was under arrest when Officer Lizar advised Mr. Lara that he was a felon in possession of a firearm. [Doc. No. 49-1 at p. 10, lines 17–20].

Mr. Lara continued to dispute the traffic violation while he was in the backseat of the patrol car. He asked Officer Lizar where he made the improper turn, and Officer Lizar responded, "When you turned onto Wilshire, sir." *See* In Car Camera Video at 3:21:53. Mr. Lara then stated, "You say I swung all the way left . . . it's only a one lane though." Officer Lizar responded, "No, it's not." Mr. Lara then stated, "But I was going to come to the Lyrewood though like immediately to the left." *See id.* at 3:22:16. Officer Lizar responded that Lyrewood Lane was not immediately to the left. Mr. Lara then asked Officer Lizar what the real reason was for pulling him over, accusing Officer Lizar of following him out of a hotel and asking Officer Lizar if his "integrity is intact." *See id.* at 3:22:53. Officer Lizar responded that he saw Mr. Lara pull out of the OnCue parking lot. *See id*. at 3:23:04. Mr. Lara insisted that Officer Lizar followed him from the hotel and then hid while Mr. Lara went inside the OnCue to get a drink, accusing Officer Lizar of "profiling."[10] *See id*. at 3:23:13 to 3:23:54.

Mr. Lara eventually stated to Officer Lizar, "I'm a working man . . . I take care of my family . . . I got in trouble 20 years ago . . . I do carry a weapon because you know how it is out here." *See id.* at 3:24:24 to 3:24:34. Mr. Lara again questioned Officer

---

[10] Defense counsel asked Officer Lizar on cross-examination if he recalled flashing his light in the parking lot at Days Inn or if he recalled driving through the parking lot of Days Inn on July 21, 2022. Officer Lizar testified that he did not recall driving through or being in the Days Inn parking lot on July 21, 2022, nor did he recall another officer from his unit driving through that parking lot that night. He stated he was parked at the OnCue. This is consistent with his preliminary hearing testimony at [Doc. No. 49-1, p. 12, lines 6–25; p. 13, line 1]. There, he testified that he did not recall seeing Mr. Lara at the Days Inn, and that he was not patrolling Days Inn specifically, but he was patrolling the area around Northwest Expressway. He testified that he got in behind Mr. Lara's car at the OnCue.

Lizar's integrity and the real reason he pulled him over, and Officer Lizar reiterated that

Mr. Lara was stopped for a traffic violation, and he was pulled out of the car because he

did not have his driver's license. *See id.* at 3:24:49 to 3:25:38. Officer Lizar's testimony

at the hearing about his conversation with Mr. Lara is consistent with the statements

made on the in-car camera video. He testified that Mr. Lara asked him several times what

the traffic stop was for, and that he told him for an improper right turn. He indicated that

at one point he clarified for Mr. Lara that the turn was improper because he turned into

the left lane instead of the right lane of the two westbound lanes of traffic. Officer Lizar

testified that Mr. Lara tried to argue that Wilshire Boulevard is a one lane road, and that

Officer Lizar told him that was not true.

Officer Lizar testified that once the tow truck arrived, he and at least two other

officers, who had arrived on the scene by that point, conducted a custodial inventory

search of Mr. Lara's vehicle. Inside the trunk of the car was 9-millimeter ammunition and

Mr. Lara's driver's license. Prior to conducting the custodial inventory search, Officer

Lizar had asked Mr. Lara if there were any other weapons in the vehicle, and Mr. Lara

responded no. *See* In Car Camera Video at 2:54:55.

Mr. Lara testified that he started his night on July 21, 2022, at a female's house,

then went to Bricktown, and ended up at the Days Inn on Northwest Expressway. He

estimated he was at the Days Inn for 20 to 30 minutes. He had followed some women he

met in Bricktown to the Days Inn, but he was not "really feeling it,"[11] so he stood in the

---

[11] On July 21, 2022, Mr. Lara told Officer Lizar he was at the Days Inn to see some strippers, but that they already had a couple of men with them, so he did not stay. *See* In Car Camera Video at 3:32:36.

Days Inn parking lot by his car. Mr. Lara testified that his car was backed into a parking space, he was standing underneath a streetlight, and he was texting the women to tell them he was going to leave. Mr. Lara said a police officer drove through the Days Inn parking lot and shined his spotlight.

Mr. Lara testified he then left the Days Inn and headed down Northwest Expressway to the Kum & Go, which he later clarified was the OnCue at Northwest Expressway and Wilshire. He went inside the OnCue to get a drink, and then came outside to his vehicle and drove around to the back of the store exiting onto Wilshire. He testified that the same officer who "lit" him up at the Days Inn was the same officer who executed the traffic stop. Mr. Lara testified that he believed he made a proper right turn onto Wilshire. He stated that after he got his car out of impound, he found his driver's license in the center console under other items.

On cross-examination, Mr. Lara admitted that it was dark that night; it was 2:30 in the morning. He testified that the officer who spotlighted him at the Days Inn did not have his car window down. He could not recall if he saw the officer's face, but that he was fairly confident it was the same officer who pulled him over for the traffic infraction. Mr. Lara conceded that multiple police patrol that area of Oklahoma City. Mr. Lara testified that the officer was behind him when he pulled out of the Days Inn parking lot, but that the officer then hid somewhere.

Mr. Lara testified that he could not recall whether he told the officer he had no weapons inside his car. Mr. Lara admitted that the officer took a handgun off his hip that night, but he initially denied that he told the officer he does carry a weapon. When

confronted with his statement that he said he was a working man trying to take care of his family and that he does carry a weapon, he stated he did not recall saying that.

Mr. Lara denied stealing the firearm from a prior girlfriend in 2021. He testified that the ammunition found inside the trunk was 9-millimeter and that he knew the ammunition was inside the trunk and that it went to the firearm that was on his hip.

## III.   ANALYSIS

### A.   Officer Lizar's traffic stop of Mr. Lara was reasonable at its inception.

Mr. Lara begins by challenging the traffic stop. Specifically, he asserts that Officer Lizar lacked reasonable suspicion to effectuate the stop and that the dash cam video "gives grave doubt as to [Officer Lizar's] ability to ascertain a traffic infraction." [Doc. No. 41 at 3].

Both parties have submitted video evidence in support of their positions. There is no allegation or indication that the video evidence was doctored or altered in any way, nor any contention that what it depicts differs from what happened. Thus, the Court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). The Court acknowledges, however, that the video does not capture everything. Therefore, in addition to relying on the video, the Court relies on Officer Lizar's testimony, which the Court finds credible.

Officer Lizar testified that the traffic violation is not visible from his dashcam video, and he explained why. His testimony was that his dashcam turns on when he activates his emergency lights, and he did not activate his emergency lights until after the traffic violation had occurred and he had caught up to the Camry. Thus, the dashcam

12

video is not a comprehensive record of the traffic violation. The Court finds nothing unusual or nefarious about the absence of the traffic violation from the recording because the dashcam was not activated at the time of the infraction. The Court specifically finds that Officer Lizar's testimony is credible as to the purpose of the traffic stop. *See United States v. Santos*, 403 F.3d 1120, 1128 (10th Cir. 2005) (explaining that the "increasing availability of videotapes of traffic stops due to cameras mounted on patrol cars does not deprive district courts of their expertise as finders of fact, or alter [Tenth Circuit] precedent to the effect that appellate courts owe deference to the factual findings of district courts").

Officer Lizar testified that he was seated inside his patrol car in the OnCue parking lot patrolling near Northwest Expressway and West Wilshire Boulevard when he observed a silver Toyota Camry make an improper right turn out of the OnCue parking lot. He testified that nothing was obstructing his view, and he was positioned where he could see the traffic coming off Northwest Expressway and West Wilshire Boulevard. He testified that he and Mr. Lara both exited the west exit onto West Wilshire Boulevard. Officer Lizar's observations are plausible based on the evidence before the Court, specifically with Defendant's Exhibit No. 1 where Officer Lizar marked the location of his patrol car with an X compared to Mr. Lara's vehicle with an O. *See* Attachment 1. There are no obstructions noted on the map between the X and the O, and with that direct line of sight, Officer Lizar's testimony about what he observed seems reasonable and plausible.

Officer Lizar's reason for why he pulled Mr. Lara over has remained the same throughout this case—including in the OCPD incident reports [Doc. No. 44-1 at 8]; in what he told Mr. Lara repeatedly in the video footage; his preliminary hearing testimony [Doc. No. 49-1]; and on the witness stand at the motion hearing. It has remained that Mr. Lara made an improper right turn by turning into the left lane of the two westbound lanes of traffic on West Wilshire Boulevard rather than the closest right lane.

The Court discounts Mr. Lara's testimony that he made a proper righthand turn out of the OnCue parking lot. In the video, Mr. Lara argues that West Wilshire Boulevard is only one lane at the west OnCue exit. When Officer Lizar said that was not true, Mr. Lara changed his story, asserting that he was going to make an immediate lefthand turn onto Lyrewood, to which Officer Lizar responded that Lyrewood Lane was not immediately to the left. *See* In Car Camera at 3:21:53 to 3:22:16. This is supported by [Doc. No. 44-5], which depicts the West Wilshire Boulevard and Lyrewood Lane intersection. Lyrewood Lane is approximately 0.3 miles away from the rear west OnCue exit. *See id. See also* [Doc. No. 44-4], depicting West Wilshire Boulevard (also known as NW 78th Street) as a four-lane road (two lanes running in each direction).

The evidence demonstrates that it is more likely than not that Officer Lizar observed a traffic violation—or, at the very least possessed a reasonable articulable suspicion that a traffic violation had occurred or was occurring. The Court finds Officer Lizar's testimony sufficient "to meet the low reasonable suspicion bar[.]" *See United States v. Anderson*, 62 F.4th 1260, 1267 (10th Cir. 2023).

A traffic stop is a seizure under the Fourth Amendment "and is subject to review for reasonableness." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020). "To be reasonable, a traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." *Id*. (citations omitted). The Tenth Circuit has explained that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc). And it is "irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.*

Further, the constitutionality of the stop does not depend on whether the driver did, in fact, commit a traffic violation. The standard is reasonable suspicion of wrongdoing. If an officer reasonably thinks he saw a driver commit a traffic infraction, then that is enough to pull him over. *See*, *e.g.*, *United States v. Reyes*, 202 F. Supp. 3d 1209, 1213 (D. Kan. 2016) (explaining that the "propriety of a stop does not depend on whether the suspect is actually guilty of committing a traffic offense; rather, the relevant question is whether it was reasonable for the officers to believe the offense had been committed") (citing *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) and *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000)).

Officer Lizar had reasonable suspicion that Mr. Lara was violating a traffic law under Okla. Stat. tit. 47, Section 11-601(1) and Oklahoma City Municipal Code Section 32-236(1). Those provisions require both the approach for a right turn and the execution

of a right turn to be made as close as practicable to the right-hand curb or edge of the roadway. Officer Lizar testified that he witnessed a driving infraction, and the Court credits that testimony combined with the statements made by Officer Lizar and Mr. Lara on the video. Thus, the traffic stop was justified at its inception.

**B.    The traffic stop was reasonable in its scope and duration.**

"An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped" because a traffic stop is a confrontation. *United States v. Albert*, 579 F.3d 1188, 1194 (10th Cir. 2009) (explaining that the motorist must suspend his or her plans and anticipate receiving a fine and possibly a jail term) (citation omitted).

The Tenth Circuit has approved the use of handcuffs in the context of a *Terry* stop. *See Albert*, 579 F.3d at 1194 (collecting cases). The Court finds that the use of handcuffs in the instant case was reasonable under the circumstances. It was in the middle of the night (2:50 a.m.). Officer Lizar was alone. Mr. Lara said he could not find his license and was digging into his pockets, the center console, and the compartments of the driver's side door. Officer Lizar did not know whether Mr. Lara was armed or had a firearm inside the vehicle.

Officer Lizar testified that he gives a person a certain amount of time to retrieve their license, but if they are unable to supply it or he starts to feel uncomfortable with where they are looking for the license, then he will ask them to step out of the vehicle. Officer Lizar's bodycam video shows Mr. Lara repeatedly checking his pockets, the

center console, the driver's side panel, and the passenger seat for nearly a minute, but he never produced a driver's license. *See* Bodycam Video at 2:49:47 to 2:50:46.

The Court also finds that the use of handcuffs did not elevate Mr. Lara's detention into an arrest, although Officer Lizar had probable cause to arrest Mr. Lara for violating two laws. The purpose of the handcuffs was so he could conduct the pat-down search safely.

A pat-down search is "constitutional when an officer has reasonable suspicion that an individual is 'armed and dangerous.'" *See United States v. Garcia*, 751 F.3d 1139, 1142 (10th Cir. 2014) (quoting *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007)). The primary justification for a pat-down search is officer safety. *See id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). The purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence. *See id*. at 1143; *Adams v. Williams*, 407 U.S. 143, 146 (1972); *United States v. Manjarrez*, 348 F.3d 881, 886–87 (10th Cir. 2003). Further, the Tenth Circuit has held that even when an officer has no knowledge of the individual possessing a weapon, an officer's safety concern still justifies a pat down. *See Garcia*, 751 F.3d at 1143 (citing *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)). In *McRae*, the officer conducting the traffic stop had no "specific information leading him to believe that [the defendant] was armed or dangerous." *McRae*, 81 F.3d at 1536. However, he had reasonable facts available to him that "would warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself," including the fact that he was by himself, and he was about to engage in a search of the car. *See id.* (explaining that an

17

officer may frisk for weapons if he has a reasonable articulable suspicion that his safety or that of others is in danger); *see also United States v. Shareef*, 100 F.3d 1491, 1501–02 (10th Cir. 1996) (explaining that the use of handcuffs does not necessarily transform a *Terry* detention into a full custodial arrest, that police officers should not be required to take unnecessary risks in performing their duties, and that when a defendant's conduct, such as a failure to produce a driver's license, contributes to a delay, he may not complain that the resulting delay is unreasonable).

Here, Officer Lizar was walking Mr. Lara back to his patrol car and was going to have Mr. Lara sit inside the patrol car with him as he ran a computer check on Mr. Lara's driver's license. He needed to ensure his safety while they were seated together inside the patrol car. Although Mr. Lara had denied that there were any weapons inside his vehicle, Officer Lizar did not know whether this was true. Additionally, without Mr. Lara's driver's license, Officer Lizar stated he could not verify Mr. Lara's identity or determine whether Mr. Lara had a history of violence or eluding police. Officer Lizar testified that he had experienced people giving fake names during traffic stops. Officer Lizar also testified that it was his routine practice to place people in handcuffs and weapon frisk them before escorting them to his police car to run computer checks, check for warrants, and issue a citation. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (explaining that police officers may take reasonable steps necessary to protect their personal safety).

The reasonable suspicion analysis does not consider an officer's observations in isolation, but rather is based on the totality of the circumstances, considering an officer's

reasonable inferences based on training, experience, and common sense. *See Garcia*, 751 F.3d at 1143. This includes the officer's knowledge and observations as well as the circumstances in which the officer is working to include the time of day and the place where the pat-down search occurred. *See id.* at 1145. Officer Lizar, unassisted at the time, and in the middle of the night, could not reasonably be expected to put Mr. Lara inside his patrol car without first checking to see if Mr. Lara had weapons. The record shows that Officer Lizar was concerned for his safety and wanted to run the requisite computer checks on Mr. Lara's driver's license without fear of violence.

It is well established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings. *See United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). The Tenth Circuit in *United States v. Dennison* explained that "[o]fficer safety is both legitimate and weighty." 410 F.3d 1203, 1211 (10th Cir. 2005) (citations omitted). To that end, the United States Supreme Court "has identified contexts where the public interest is such that neither a warrant nor probable cause is required" to handcuff (or detain) a driver and a passenger of a vehicle during a traffic stop and conduct a pat-down search if the officer has reasonable suspicion they may be armed or dangerous. *See id.* (explaining that officers "may take steps to protect themselves and others, provided the measures are not too intrusive and the government's strong interest in officer safety outweighs the motorist's interests"). *See also Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (an officer making a traffic stop can order the vehicle's occupants out of the car pending completion of the stop).

Here, Mr. Lara was not able to produce a valid driver's license; thus, it was necessary to run a computer check to determine if he had a valid driver's license. Officer Lizar could detain him long enough to run a computer check of his license and to verify ownership of the vehicle.

Officer Lizar was working alone when he conducted the traffic stop at roughly 2:40 a.m. in the morning. Since Mr. Lara could not produce a driver's license, Officer Lizar had no ability to confirm his identity. Leaving Mr. Lara in his vehicle and turning his back on him to return to his patrol car to check Mr. Lara's story risked Officer Lizar's safety. The most practicable means to continue the traffic stop and to ensure officer safety was a brief detention and pat-down. As such, the traffic stop was reasonable in its scope and duration.

**C.     Officer Lizar placing handcuffs on Mr. Lara did not amount to an arrest.**

The Court finds that handcuffing Mr. Lara prior to the pat-down search did not amount to an arrest. Although Officer Lizar, when specifically asked by government counsel, testified about probable cause arrest situations, and indicated he believed he had probable cause to arrest Mr. Lara for his failure to produce a driver's license and for making an improper right turn, Officer Lizar's testimony was that he arrested Mr. Lara for being a felon in possession of a firearm. He never indicated specifically that he arrested Mr. Lara for not having his driver's license or for the traffic violation. He simply testified both were arrestable offenses. This testimony was consistent with Officer Lizar's testimony at the state preliminary hearing that Mr. Lara became an arrestee after Officer

Lizar found the firearm on Mr. Lara's person and confirmed he was a convicted felon. [Doc. No. 49-1 at p. 20, lines 15–20].

Alternatively, had the Court concluded the handcuffing was an arrest, there was probable cause to support an arrest for a violation of Okla. Stat. tit. 47, § 6-112(A), which requires every licensee to always have his driver's license in his "immediate possession" when operating a motor vehicle. That same provision provides that "[u]pon demand of a peace officer, the licensee shall produce and provide physical possession of the driver license to the peace officer," and any person violating this provision shall be guilty of a misdemeanor upon conviction. *See* Okla. Stat. tit. 47, § 6-112(A). This provision expressly contemplates arrest in § 6-112(B). *See id.* § 6-112(B) ("at the time of his or her arrest"); *see also Moody v. State*, 738 P.2d 942, 943 (Okla. Crim. App. 1987) (concluding that a driver's failure to produce his driver's license when requested by the trooper who effectuated the traffic stop justified his arrest for driving without a valid license in violation of Okla. Stat. tit. 47, § 6-112). The Court finds that Officer Lizar gave Mr. Lara sufficient time to produce his driver's license, and Mr. Lara never offered at any time that his driver's license was inside the trunk next to the ammunition.

## IV.   **CONCLUSION**

For these reasons, the Court DENIES Defendant's Motion to Suppress [Doc. No. 41].

IT IS SO ORDERED this 4th day of May 2023.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE



ATTACHMENT 2 (Cheto Lara CR-22-464-JD